IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| DOWNRANGE HEADQUARTERS, LLC,<br><br>Plaintiff,<br><br>v.<br><br><br>2494924 ONTARIO INC.; TOM MANDY; ARCTIC SHELL, INC.; and CORNEL HACKE,<br><br>Defendants. | **AMENDED MEMORANDUM DECISION AND ORDER DENYING MOTIONS TO DISMISS**<br><br><br>Case No. 2:18-cv-924<br><br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Downrange Headquarters, LLC, has sued two Canadian companies, 2494924 Ontario Inc. and Arctic Shell, and their respective principal employees, Tom Mandy and Cornel Hacke. Downrange alleges that Defendants violated the federal Defend Trade Secrets Act and the Utah Uniform Trade Secrets Act, committed two intentional torts, and breached a contract with Downrange. Defendants have moved to dismiss for lack of personal jurisdiction. For the reasons explained below, this court denies the motions to dismiss.

# I.

Downrange sells target systems and other products to shooting ranges.[1] On December 8, 2015, 2494924 Ontario entered into a written contract with Downrange, a Utah-based company, to transfer intellectual property to Downrange and to develop additional products for Downrange. Dkt. No. 40 at 6 ¶ 1; Dkt. No. 2 ("Compl.") ¶ 13, 16. As part of the contract, Defendant Mandy "personally agree[d] to provide exclusive Consulting services" to Downrange "for a period of five (5) years or longer." Dkt. 40 at 7 ¶ 1.02; *see also* Compl. ¶ 13.

Pursuant to the contract, 2494924 Ontario agreed "not to use or disclose in the United States or Canada for ten (10) years … any trade secrets, proprietary information or other information including printed material, signage or electronic media, relating to" the subject matter of the contract or material to Downrange's business. Dkt. No. 40 at 11 ¶ 7.02; Compl. ¶ 21. 2494924 Ontario also agreed not to

- "own, manage, operate, join, control, participate in, invest in, or otherwise be connected with, . . . any business entity which is engaged in, or is in any way related to or competitive with," the products sold to Downrange,
- "persuade or attempt to persuade any current client or former customer of [Downrange] to cease doing business, or to reduce the amount of business it does or intends or anticipates doing with, [Downrange], or
- solicit the "business of any of such customer or former customer with respect to the business conducted by [Downrange]" and the products sold to Downrange.

---

[1] The court's recitation of facts is drawn from the terms of the Contract between Downrange and 2494924 Ontario as well as from the allegations contained in Plaintiff's Complaint, other pleadings, and affidavits.

2

Dkt. 40 at 11 ¶ 7.02(c) Compl. ¶¶ 20–24. Mandy also "personally" committed to "for a period of ten (10) years from the closing date,… [not] directly or indirectly: design, own, manage, operate, join, control, participate in, invest in, or otherwise be connected with … any business entity which is engaged in, or is in any way related to or competitive with," the property that 2494924 Ontario sold to Downrange. Compl. ¶ 26; Dkt. 40 at 12 ¶ 7.02(c).

With the help of Defendants Arctic Shell and Hacke, Mandy and 2494924 Ontario worked to fulfil the contract throughout 2016 and 2017. Compl. ¶ 31. To accomplish this, Hacke and Mandy communicated frequently via phone calls and emails with Downrange's Utah-based employees. Doc. 22-1 ¶ 23. And Mandy and 2494924 Ontario accepted payments sent by Downrange from Utah to Canada. Compl. ¶ 7.

In the course of performing the contract, Mandy and Hacke visited the United States multiple times. Mandy delivered products directly to customers in New York, Missouri, and—accompanied by Hacke—Colorado. Dkt. No. 21 at 10; Dkt. No. 21-1 at 4. Both Hacke and Mandy attended a trade show in Nevada multiple times, "where they actively assisted Downrange with marketing and selling its products to potential customers." Dkt. No, 21 at 10; Dkt. No 21-1 at 5. Mandy also met with a potential client in Georgia. Dkt. No. 21-1 at 4.

But at some point the relationship soured. Defendants Hacke and Artic Shell stole intellectual property—the very property that had been sold to Downrange—and used the property to create products "nearly identical" to Downrange's, Dkt. Nos. 21, 22 at 6; Dkt. No. 21-1 at 6, which Arctic Shell then sold in competition with Downrange, *see* Compl. ¶¶ 64–85. Hacke and Arctic Shell sold an Idaho company designs that replaced designs produced by Downrange, *see* Dkt. No. 21 at 6, disparaging Downrange in the process, *see* Dkt. No. 51-2 at 5. The Idaho company then hired Artic Shell to assist it in bidding for a project in Alexandria,

Virginia. Doc. 51-2 at 3. Once the bid was complete, the Virginia company "used Artic Shell's drawings in its published bid information." Dkt. No. 46 at 4. In June 2018, Hacke represented the same Idaho company in touting that company's products at a pre-bid meeting in Hawaii. Doc. 51-2 at 3–4. Mandy and 2494924 Ontario assisted Hacke and Arctic Shell in these activities. *See* Compl. ¶¶ 78, 81.

Downrange sued Defendants, bringing claims for breach of contract, tortious interference with contract, intentional interference with economic relations, and violations of the federal Defend Trade Secrets Act and the Utah Uniform Trade Secrets Act. *See* Compl. ¶¶ 86-126. Defendants moved to dismiss the complaint, claiming that this court lacks jurisdiction over them.

## II.

To overcome a jurisdictional challenge during "the preliminary stages of litigation, the plaintiff's burden is light." *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008). Where, as here, no evidentiary hearing is held, "the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *Id.* at 1057. "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *Id*. "When evaluating the prima facie case, the court is bound to resolve all factual disputes in favor of the plaintiff in determining whether he has made the requisite showing." *Id.* In addition, "[t]he 'well pled facts' of the complaint must be accepted as true if uncontroverted by the defendant's affidavits[.]" *Fed. Deposit Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992).

## III.

Downrange contends that Defendants' contractual relationship with Downrange, as well as Defendants' tortious and unlawful conduct against Downrange, establish sufficient contacts

with Utah to allow the exercise of specific personal jurisdiction under Utah's long-arm statute. In the alternative, Downrange contends that Defendants' contractual relationship and the tortious and unlawful conduct establish sufficient contacts with the United States as a whole to allow for the exercise of specific personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2).

Because it is "clearer and more straightforward" to determine whether this court has specific personal jurisdiction "under Rule 4(k)(2) than under" Plaintiff's other theories, this court will first address whether there is jurisdiction under this Rule. *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 652 (5th Cir. 2004). And because the court finds that each Defendant had sufficient contacts with the United States as a whole to support specific jurisdiction under Rule 4(k)(2), it need not decide whether Defendants had sufficient contacts with Utah to support personal jurisdiction under Utah's long-arm statute.

Rule 4(k)(2) provides as follows:

For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:

(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and

(B) exercising jurisdiction is consistent with the United States Constitution and laws.

Here, Plaintiff has alleged a claim arising under the federal Defend Trade Secrets Act. "[O]nce a district court has personal jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction." *United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002) (citations omitted). Thus, if Rule 4(k)(2) grants this court jurisdiction over the federal claim, it has jurisdiction over the state law

claims as well, for these claims all arose from the same disputed contract, the same alleged tortious conduct (including the theft of trade secrets), or both.

It is undisputed that summonses have been served. *See* Dkt. Nos. 15, 16, 23, 24. This court must accordingly consider whether any State's courts of general jurisdiction have jurisdiction over defendants in this matter and examine whether exercising jurisdiction is consistent with the United States Constitution and laws.

The Fifth, Seventh, Ninth, Federal, and D.C. Circuits—as well as three judges in this District—have held that "[i]f … the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)."[2] Neither party has asked this court to depart from this rule, which frees the court from a duty to "ponderously traipse through the 50 states, asking whether each could entertain the suit." *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) (Garland, J., for a unanimous panel) (internal quotation marks and citation omitted). This court thus follows this approach. Because defendants contend that "there is no other United States judicial district in which [Defendants] are subject to the court's personal jurisdiction with respect to this case" and that "the only possibly appropriate forum for this case is Ontario, Canada," Dkt. No. 8 at 14–15; Dkt. No. 9 at 15, this requirement of Rule 4(k)(2)(A) is satisfied.

All that remains—and indeed, the only point that Defendants dispute, *see* Dkt. Nos. 29, 30 at 5–6—is whether "exercising jurisdiction is consistent with the United States Constitution

---

[2] *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1415 (Fed. Cir. 2009); *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007); *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005); *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004); *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001), *as amended* (July 2, 2001); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1335 (D. Utah 2006); *Xactware, Inc. v. Symbility Sol. Inc.*, 402 F. Supp. 2d 1359, 1370 (D. Utah 2005); *Ivanti, Inc. v. Shea,* No. 2:18-CV-92 TS, 2018 WL 1033205, at *8 (D. Utah Feb. 21, 2018).

and laws." Fed. R. Civ. Proc. 4(k)(2)(B). As a general matter, "[d]ue process requires both that the defendant 'purposefully established minimum contacts within the forum State' and that the 'assertion of personal jurisdiction would comport with fair play and substantial justice.'" *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). In cases where personal jurisdiction is asserted pursuant to a federal statute or rule authorizing nationwide service of process such as Rule 4(k)(2), however, the analysis is slightly different. For in such cases, due process limits on personal jurisdiction flow from the Fifth Amendment rather than the Fourteenth Amendment. *See Peay v. BellSouth Med. Assistance Plan,* 205 F.3d 1206, 1209–10 (10th Cir. 2000). To determine whether the exercise of personal jurisdiction comports with due process in such cases, "the Court first analyzes Defendant's contacts with the United States as a whole, not just the forum state . . . ." *Ivanti, Inc. v. Shea,* No. 2:18-CV-92 TS, 2018 WL 1033205, at *7 (D. Utah Feb. 21, 2018); *see also Archangel Diamond Corp. Liquidating Tr. v. OAO Lukoil*, 75 F. Supp. 3d 1343, 1365 (D. Colo. 2014).

In determining minimum contacts, most courts limit the inquiry to the defendants' contacts "at the time the lawsuit was filed."[3] While this court has not found Tenth Circuit law addressing this issue, it follows the majority rule. The court must "determine whether the plaintiffs' allegations ... make a prima facie showing of the minimum contacts necessary to establish jurisdiction over *each* defendant[.]" *See Fireman's Fund Ins. Co. v. Thyssen Min. Const. of Canada, Ltd.,* 703 F.3d 488, 492 (10th Cir. 2012) (emphasis added).

---

[3] *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 52 (2d Cir. 1991); *see Rice v. Karsch,* 154 Fed. Appx. 454, 462 (6th Cir. 2006)*; Gonzalez Corp. v. Consejo Nacional De Produccion de Costa Rica,* 614 F.2d 1247, 1254 (9th Cir. 1980); *Duravest, Inc. v. Viscardi,* 581 F. Supp. 2d 628, 639 (S.D.N.Y. 2008)*; Brunson v. Kalil & Co.,* 404 F. Supp. 2d 221, 236 (D.D.C. 2005).

Mandy not only signed the contract with Downrange, a United States company, on behalf of 2494924 Ontario, but also had ongoing personal obligations to Downrange under that contract. *See supra* at 2–3. Plaintiff alleges that in performing the contract, Mandy sent communications to Downrange employees in Utah and traveled to New York, Georgia, Missouri, Nevada, and Colorado. Dkt. No. 21 at 10; Dkt. No. 21-1 at 5–6. Plaintiff also alleges, "[u]pon information and belief" that "Mandy …. knew and assisted Hacke with the misappropriation of Downrange's trade secrets, in direct violation of the [contract]." Compl. ¶ 66. In other words, Plaintiff alleges that Mandy assisted in the misappropriation of trade secrets owned by a United Sates company—misappropriation that was carried out in part through conduct within the United States and that Mandy knew or should have known would cause injury within the United States. Although Mandy argues that he has not "actively or intentionally solicited business in the United States[,]" Dkt. No. 51-1 at 4,  he has not squarely denied any involvement in Hacke's activities. Mandy also argues that he did not have any personal obligations under the contract with Downrange. *See* Oral Argument at 48:00-51:00. Based on its review of the contract, the court rejects this argument as a matter of law.[4]

---

[4] *See, e.g.*, Dkt. No. 40 at 7 ¶ 2 ("As part of this Purchase Agreement, the Owner of Seller, Tom Mandy (herein "Consultant"), personally agrees to provide exclusive Consulting services to Buyer for a period of five (5) years or longer as agreed to by both Parties following the closing of this agreement."); *id.* at 12 ¶ 7.02(c) ("Seller Owner Tom Mandy personally, for a period of ten (10) years from the closing date shall not . . . directly or indirectly: design, own, manage, operate, join, control, participate in, invest in, or otherwise be connected with, …, any business entity which is engaged in, or is in any way related to or competitive with, the Brand, the Products and the Promotion thereof."); *id.* ¶ 7.02(d) ("In the event of a breach or threatened breach by Seller, or Tom Mandy personally, of the covenants in this section . . ."). Moreover, Mandy would only be shielded from acts he took on behalf of 2494924 Ontario if the fiduciary shield doctrine applies. *See Newsome v. Gallacher*, 722 F.3d 1257, 1275 (10th Cir. 2013). The Tenth Circuit has made clear that this doctrine has "no necessary connection to minimum contacts analysis" and is thus relevant in this context only if it arises from some other source, such as "a judicial rule of construction for interpreting the scope of a state's long-arm statute." *Id*. at 1276. Defendants have not argued that Rule 4(k)(2) incorporates the fiduciary shield

Not surprisingly, Plaintiff makes essentially the same allegations regarding 2494924 Ontario—indeed, Mandy is 2494924 Ontario's owner, president, and principal employee—and Plaintiff appears to maintain that all of the relevant actions allegedly taken by Mandy are also attributable to 2494924 Ontario as his employer. *See, e.g.*, Compl. ¶¶ 51–62. Defendants likewise makes essentially the same arguments in response—except that Defendants do not dispute that 2494924 Ontario did have a contractual relationship with Plaintiffs.

Plaintiff alleges that Hacke assisted Mandy and 2494924 Ontario in executing the contract with Downrange, a United States company, including by interacting with Downrange and its customers in Colorado and Nevada. Dkt. No. 22 at 4–5. In addition, Plaintiff alleges that Hacke marketed products and bid on projects in direct competition with Downrange through his company, Arctic Shell. To do this, Hacke allegedly stole Downrange's intellectual property and used the property to create products "nearly identical" to Downrange's, Dkt. Nos. 21, 22 at 6; Dkt. No. 21-1 at 6. Hacke then sold Arctic Shell's "specifications and [] conceptual drawings" to an Idaho company that it intended to use to bid on a Virginia project. *See* Dkt. No. 51-2 at 3. The Virginia company "used Artic Shell's drawings in its published bid information." Dkt. No. 46 at 4. Plaintiff alleges that Hacke also disparaged Downrange's products to the Idaho company and that Downrange lost business as a result. *See* Doc. 51-2 at 2, 5. If these allegations are true, there can be little doubt that Hacke knew or should have known that his actions would cause injury to Downrange, a United States company. In addition, at least one of Hacke's interactions with the Idaho company took place in the United States: Hacke admits that he represented the Idaho company in a tour of a Hawaii facility. *See* Dkt. No. 51-2 at 3–4.

---

doctrine, and at least one circuit has rejected that proposition, *see ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001), *as amended* (July 2, 2001).

For its part, Arctic Shell was the company that Hacke allegedly used to market products and to bid on projects that directly competed with Downrange. And Plaintiff appears to maintain that Arctic Shell is responsible for the actions taken by Hacke, its President and principal employee, in misappropriating Downrange's trade secrets and disparaging Downrange's products. *See* Compl. ¶¶ 64–85.

Based on the Complaint and Plaintiff's other filings, it thus appears that Defendants engaged in an ongoing contractual relationship with a Utah company and that at least some of the acts taken by Defendants in performing the contract took place within the United States—including visits by Hacke and Mandy to Nevada, Colorado, and—in the case of Mandy—New York, Georgia, and Missouri. It likewise appears that Defendants committed intentional torts and other unlawful acts—including the misappropriation of trade secrets belonging to a Utah company—through conduct carried out at least in part within the United States and virtually certain to cause injury within the United States. Indeed it appears that the "express aim" of Defendants' actions in Hawaii, Idaho, and Virginia was to improperly compete with and tortuously injure a Utah resident, "and neither the lack of defendants' physical presence in [Utah] nor the fact that they used a[n] [Idaho]-based entity to effectuate this purpose" should foreclose a finding of sufficient minimum contacts with the United States. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1076 (10th Cir. 2008). The filings also confirm that the alleged actions by Defendants relied on here took place before the Complaint was filed. The court thus finds that the alleged affirmative actions taken by each Defendant are sufficient to establish minimum contacts with the United States.[5]

---

[5] Specific jurisdiction requires not only that a defendant have minimum contacts with the forum, but also that the plaintiff's claims "arise out of defendant's forum-related activities." *Newsome v. Gallacher*, 722 F.3d 1257, 1269 (10th Cir. 2013). Although Defendants argue that

Even once service and minimum contacts are established—as they are here—that is not the end of the personal jurisdiction inquiry under the Fifth Amendment's Due Process Clause. Rather, a defendant may attempt "[t]o defeat personal jurisdiction" by "establish[ing] that the 'chosen forum will make litigation ... gravely difficult and inconvenient' or, in other words, the forum district burdens the defendant with 'constitutionally significant inconvenience.'" *Klein v. Cornelius*, 786 F.3d 1310, 1318 (10th Cir. 2015) (quoting *Peay*, 205 F.3d at 1212). The court examines "non-exclusive factors in considering whether defendants have met this burden, such as (1) the extent of contact with the forum state, (2) the inconvenience of having to litigate in a foreign jurisdiction, (3) judicial economy, (4) the probable situs of the discovery proceedings, and (5) the nature of the defendant's activities and its impact beyond his state's borders." *Id.*[6]

In applying these factors, no one factor is dispositive. For example, in *Klein* the defendant argued that even though he was subject to nationwide service under a federal statute, he lacked minimum contacts with Utah and thus could not be sued in Utah. *Id.* at 1317–18. The

---

their alleged forum-related conduct does not suffice to create minimum contacts, they do not appear to argue that Plaintiff's claims do not arise out of this alleged conduct. Nor would such an argument have merit. As discussed above, many of the actions giving rise to Defendants' contractual obligations, much of the conduct that Plaintiff argues breached these obligations, much of the conduct on which Plaintiff's statutory and tort claims are based, and Plaintiff's alleged injuries all took place within the United States.

[6] While the Tenth Circuit has not applied this due process analysis to a Rule 4(k)(2) case involving foreign citizens, at least one district court in this Circuit has. *See Archangel Diamond Corp. Liquidating Tr. v. OAO Lukoil*, 75 F. Supp. 3d 1343, 1372 (D. Colo. 2014). Nor should the fact that Defendants are foreign citizens entitle them to special solicitude under the Fifth Amendment—if anything, foreign citizens would be entitled to less solicitude under this Amendment than United States citizens. As discussed below, venue statutes do not grant protections to persons outside the United States. Other constitutional protections afforded to residents of the United States are similarly unavailable to foreign nationals. This court thus has little difficulty concluding that foreign defendants are not entitled to additional due process protections but are at most entitled to the same protections that the Tenth Circuit has held apply to United States citizens.

Tenth Circuit rejected this argument, noting that "insignificance of contact is only one consideration" under the Fifth Amendment analysis once minimum contacts with the United States as a whole are established. *Id.* at 1318. Thus, rather than applying a traditional minimum contacts test with respect to contacts with Utah, this Court will consider contacts with Utah only as one of several non-exclusive factors.

Defendants make several arguments that relate to these nonexclusive fairness factors. First, Defendants argue that they have few, if any, contacts with Utah. Arctic Shell and Hacke note that Hacke has never been to Utah. Dkt. No. 30 at 8. Mandy and 2494924 Ontario likewise argue that Downrange initiated the contract, and that they do not target their business at Utah residents. Doc. 29 at 4–5. But this is not the whole story. Rather, aided by Mandy and 2494924 Ontario, Defendants Hacke and Arctic Shell have allegedly committed torts whose harm they knew, or at least should have known, would be felt in Utah. And Mandy and 2494924 Ontario, with the aid of Hacke and Arctic Shell, engaged in an ongoing contractual relationship with a Utah company, working with and receiving money from Downrange. Thus, whether or not each Defendant's contacts with Utah would suffice to establish minimum contacts with the State under controlling Supreme Court and Tenth Circuit precedent, Defendants certainly have a non-trivial level of contacts with Utah.

Second, Defendants complain that "it would be extremely burdensome for [Arctic Shell, Hacke,] 2494924 Ontario[,] and Mandy to litigate this case in the United States," as Defendants "are located in Canada and have minimal, infrequent contacts with the United States." Doc. 29 at 8; Doc. 30 at 8. But defendants have retained local counsel and have participated in business dealings in at least five States—Utah, Idaho, Nevada, Colorado, Virginia, and Hawaii. While Ontario is not particularly close to Utah, it is far closer than Hawaii, where Hacke participated in

a pre-bid event on behalf of an Idaho company. This Court thus concludes that it would not be overly inconvenient for Defendants to defend the suit in this Court.

Third, Defendants suggest that "[t]he majority of the potentially relevant documents and witnesses are located in Canada and are likely outside the jurisdiction of [this] court for discovery purposes." Doc. 29 at 8; Doc. 30 at 8. While discovery would likely take place in Canada, however, it would also likely take place in the United States, both in Utah and in the States where Defendants marketed the products that allegedly incorporated Plaintiff's trade secrets. While Defendants emphasize the location of their own employees and documents, they do not dispute that the Idaho firm and Downrange may have discoverable materials that are located in the United States and relevant to this litigation.

Finally, the court notes that although Defendants deny Plaintiff's allegations of wrongful conduct, they do not address the impact of their alleged conduct on the United States. Plaintiffs have alleged Defendants stole trade secrets belonging to a United States company and used them to market products to another United States company. The alleged misappropriation and other unlawful or tortious conduct were effectuated through actions that occurred at least partly in the United States and caused injury within the United States to a United States company. The court finds that domestic impact of the alleged conduct at issue in this case weighs in favor of jurisdiction under the Fifth Amendment analysis prescribed by the Tenth Circuit.

Defendants have not shown that this forum is so unfair or unreasonable as to violate the Fifth Amendment. This court thus has personal jurisdiction over Defendants under Rule 4(k)(2) with respect to Plaintiff's claim under the federal Defend Trade Secrets Act. And as explained above, because the court has jurisdiction over this federal claim, it also has personal jurisdiction over the Defendants with respect to Plaintiff's remaining claims.

## IV.

Defendants' remaining arguments require little discussion. Defendants claim that venue is improper, Dkt. Nos. 8, 9 at 17–18, but 28 U.S.C. § 1391(c)(3) provides that "a defendant not resident in the United States may be sued in any judicial district." This statute reflects the "long-established rule that suits against aliens are wholly outside the operation of all the federal venue laws, general and special." *Brunette Machine Works, Ltd. v. Kokum Industries, Inc.*, 406 U.S. 706, 708–14 (1972). Venue is thus irrelevant to this case and Defendants' argument fails.

Defendants also ask this court to dismiss the case under the discretionary doctrine of *forum non conveniens*. But "normally there is a strong presumption in favor of hearing the case in the plaintiff's chosen forum." *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 606 (10th Cir. 1998). True, this Court may need to apply Canadian law at some point during this case. But if Plaintiff's case were brought before a Canadian court, that court would likely need to apply Utah and United States law to adjudicate at least some of Plaintiff's claims. For example, the Canadian court would need to interpret the Defend Trade Secrets Act—assuming it would even be willing to enforce that federal statute—which cuts against Canada being a better forum. And if the Canadian court would decline to enforce that statute, that also is a reason this court should exercise jurisdiction, for this federal statute makes clear the United States' strong interest in protecting its citizens' trade secrets. In light of these considerations, the court will not dismiss this case on the ground that Canada might be a more convenient forum.

**ORDER**

Based on the foregoing, the motions to dismiss are DENIED. IT IS SO ORDERED.

DATED this 22nd Day of November, 2019.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Court Judge